39 C.C.P.A.(Patents)

### Application of MILLER.
Patent Appeals Nos. 5893, 5894.

United States Court of Customs and Patent Appeals.

Dec. 18, 1951.

J. T. Basseches, New York City, for appellant.

E. L. Reynolds, Washington, D. C., for Commissioner of Patents.

Before GARRETT, Chief Judge, and JACKSON, O'CONNELL, JOHNSON, and WORLEY, Judges.

GARRETT, Chief Judge.

These are appeals from decisions of the Commissioner of Patents denying applications for the extension of the terms of two patents issued to appellant, as the inventor of the subject matter, prior to September 2, 1945.

The applications are predicated upon Public Law 598, 81st Congress, Second Session, which became effective June 30, 1950, 64 Stat. 316, 35 U.S.C.A. § 115 et seq.

The pertinent paragraphs of the act read:

Sec. 1. "That any person who served honorably in the military or naval forces of the United States at any time between December 7, 1941, and September 2, 1945—

"(a) who is the inventor or discoverer of an invention or discovery for which a patent was granted to him prior to September 2, 1945, the original term of which had not expired prior to said date and which is still owned by him, or who was prior to said date and continuously thereafter the sole owner of a patent for an invention or discovery which had not expired prior to said date; and

"(b) who, between December 7, 1941, and the date of the termination of his service but not later than the date of enactment of this Act, was not receiving income from said patent or patented invention or discovery; or whose income therefrom was substantially reduced as a result of said service or because of the war, may obtain an extension of his patent for the term specified herein, upon application to the Commissioner of Patents within one year after the enactment of this Act and upon complying with the provisions of this Act. The period of extension of such patent shall be a further term from the expiration of the original term thereof equaling twice the length of the portion of his said service between the dates of December 7, 1941, and September 2, 1945, during which his patent was in force."

A Certificate of Service, which is a part of the record before us, states that appellant "honorably served in active Federal Service in the Army of the United States from 6 October 1942 to 3 November 1945."

The appeals are accompanied by a stipulation signed by the attorney for appellant

and the Solicitor for the Patent Office, which reads: "It is hereby stipulated for the purpose of facilitating consideration by the Court of the matters involved in the petitions for extension of the terms of patent No. 2,046,960 dated July 7, 1936 and patent No. 2,206,913 dated July 9, 1940 under Public Law No. 598; that the records connected with these two petitions be consolidated in accordance with the praecipe for a consolidated record; and that items 6 to 15 inclusive, listed in the attached praecipe appear in the records of both patents and of both petitions and that the single set of these papers included in the present record shall be read as applicable to both patents and to both petitions and shall have the same force and effect as if two sets of such papers, one from each patent file and from each petition, were included in the transcript of record."

The material issue is identical in the two cases. Items 6 to 15, inclusive, of the praecipe, referred to in the stipulation, appear in the record in connection with Appeal No. 5893. So, that appeal will be first considered.

### Appeal No. 5893.

The patent involved in this appeal bears the title "High Voltage Electrode Housing." It is numbered 2,046,960 and is dated July 7, 1936. Normally, it will expire seventeen years from that date. Appellant seeks an extension of five years, nine months and twenty-two days (that is, until April 28, 1959), which is twice the period from the date of his induction into the military service (October 6, 1942) to September 2, 1945, when hostilities closed with the surrender of Japan.

It is deducible from the record before us that, after the patent had been issued, and beginning at least as early as 1940, a contract was in effect between appellant and Corning Glass Works of Corning, New York, whereby the latter was granted "the exclusive right and license to manufacture, use and sell the glass parts entering into the assembly disclosed in the aforementioned patent." No copy of the contract is in the record and the quoted clause is taken from an affidavit of appellant. The affidavit recites also that Corning Glass Works "agreed to pay a royalty for each glass part sold by it and after the first year of operation agreed to pay a minimum royalty of $2500.00 (Two Thousand Five Hundred Dollars) per annum." Thirty sheets, purporting to give statements of royalties paid to appellant during the years 1940 to 1945, inclusive, are in the record, and such payments are summarized in the affidavit. The largest payment ($5,634.30) was made during 1941 and the smallest ($572.75) during the year 1943. This smallest sum was paid after there had been a modification of the original contract, in the latter part of September 1942, under which modification Corning Glass Works agreed to pay appellant "$500.00 annual minimum royalties for each contract year" during "the remainder of the war and such time thereafter as is required to get back into regular production, * * *."

The modifying agreement is shown to have been entered into because the Corning Glass Works' production of the products had been suspended by order of the Government as a war measure. In the latter part of 1945 the old contract was renewed and Corning Glass Works paid appellant $3,890 as royalties for that year.

As we view the case, the foregoing facts, relative to the contract between appellant and the Corning Glass Works, have no particular bearing upon the actual issue, or issues, involved, but their recital as a part of the history of the case is deemed proper.

In the brief for appellant, the facts are referred to as satisfying section 1(b) of the law which appellant invokes "in that between December 7, 1941 [date of the Japanese attack on Pearl Harbor] and up to the date of the passage of the Act [June 30, 1950], income from the patents was substantially reduced as a result of appellant's service or because of the war."

The difficulty which confronts appellant grows out of an instrument recorded in the United States Patent Office which reads as follows:

"Instrument dated Jan. 6, 1947. (Acknowledged.)

"Recorded Jan. 23, 1947. Liber G 210 page 560.

| "Samuel C. Miller to Luminous Tube Products Corporation, New York, N. Y., corporation of N. Y. | Samuel C. Miller, Inventor. High Voltage Electrode Housing. July 7, 1936    2,046,960 and other inventions of this inventor. |
|---|---|

"Assignor assigns to assignee entire right, title and interest in the inventions described in said patents, subject to an agreement with him dated Sept. 30, 1946."

It is apparent that by the foregoing instrument appellant assigned to Luminous Tube Products the entire right, title and interest in the inventions described in the patents referred to, patent No. 2,046,960 being specifically named.

The instrument recites that the assignment was made "subject to an agreement with him [meaning, we suppose, with appellant, Miller] dated Sept. 30, 1946." Since that agreement was dated, it is a fair assumption that it was written, but it was not recorded, and of itself it gives no information as to its character or meaning.

The brief for appellant refers to the instrument as a "conditional assignment"; declares it to be "abortive of the intention of the parties"; and directs attention to what is declared to be a "renunciation" of it "except insofar as it concerned royalties which were assigned to the Luminous Tube Products Corporation." The "renunciation" was recorded in the Patent Office November 12, 1949. As certified in the record before us it reads:

"Instrument acknowledged Nov. 9, 1949.

"Recorded Nov. 12, 1949. Liber B 222 page 168.

| "Luminous Tube Products Corporation corporation of N. Y. to Samuel C. Miller. | Same as Previous Brief. |
|---|---|

"Recites that assignor had recorded on its behalf the instrument recorded in the U. S. Patent Office in Liber G 210, page 560; that said instrument was purported to have been executed in accordance with an agreement with assignee dated Sept. 30, 1946, and that said agreement intended that assignee should assign his interest in all royalties or other income due him under the license agreement referred to therein. Assignor renounces that it purchased or intended to purchase or have assigned to it the entire right, title and interest in the inventions described in said patents; and affirms that assignee at all times had and now has the entire right, title and interest in said inventions, subject to its right in said royalties, etc."

Alluding to the immediately foregoing instrument the brief of the Solicitor for the Patent Office says: "By papers dated November 9, 1949 and recorded November 12, 1949, the patents were reassigned to the appellant. While those papers vehemently assert that the former assignment was a mistake and should be disregarded, it is clear that they can have no retroactive effect. Whatever the assignor and assignee now allege, it is evident that title to the patents was not in the appellant between January 6, 1947 and November 9, 1949. As was held by this Court in Re Field [190 F.2d 268, 38 C.C.P.A., Patents, 1175], a party who has voluntarily executed an assignment cannot be heard to argue, when it suits his interest that the assignment was not all it purported to be."

In support of this position the brief directs attention to the rule of the Patent Office relating to assignments. The rule in force on January 23, 1947, when the first of the above quoted instruments was recorded, was numbered 187 and read as follows[1]: "187. Assignments which are made conditional on the performance of certain stipulations, as the payment of money, if recorded in the office are regarded as absolute assignments until canceled with the written consent of both parties or by the decree of a competent court. The office has no means for determining whether such conditions have been fulfilled."

The second instrument does not impress us as being a reassignment, or reconvey-

1. It was succeeded March 1, 1949, by present Rule 333, 35 U.S.C.A.Appendix, which contains some changes in phraseology which are not here material.

ance, to appellant of that which he had conveyed by the first. The second contains no words ordinarily used in making a conveyance. At most it is nothing more than an effort to "renounce" a portion of the first. Luminous Tube Products Corporation certainly retained the rights in the royalties which, according to the record, were then being paid under the contract with Corning Glass Works. So, even under the interpretation placed upon the first instrument by the last, appellant had parted with the royalty interests incident to his patent and, to that extent, had ceased to be the sole owner of the patent.

However, even if the last instrument be construed as a reassignment, or reconveyance, to appellant of all which he had conveyed originally, we are unable to agree that he is entitled to have the term of the patent extended, because during the period from January 23, 1947, to November 12, 1949, it was a matter of public record in the United States Patent Office that the "entire right, title and interest" in the invention described in Patent No. 2,046,960 was vested in Luminous Tube Products Corporation by a duly recorded conveyance executed by appellant.

It is true that the conveyance recited that it was subject to an agreement with appellant dated September 30, 1946. As has been stated, that agreement was not recorded. It may be that it was an agreement which, by its terms, rendered the conveyance a "conditional assignment" as is asserted in the brief for appellant, but under the Patent Office rule, 187, supra, then in force, the validity of which is not questioned, the office necessarily regarded the instrument as an absolute conveyance.

Seemingly the Commissioner of Patents treated it as a reconveyance, and the decision turned upon the meaning given the phrase "is still owned by him" appearing in section 1(a), supra, of the law here involved. He held that the law requires *"continuous* [italics ours] ownership by the inventor beginning at a time prior to September 2, 1945" and since Miller did not own the patent between January 23, 1947, and November 12, 1949, denied his right to an extension.

It is insisted on behalf of appellant, in effect, that the law does not require continuous ownership by the inventor and that even though he may have parted with the entire right, title, and interest in his invention if he obtains a reconveyance of the patent which covers such invention, it properly may be held that he still owns it.

We are unable to agree that the context of the act justifies the construction so sought.

As was pointed out by us in the recent case of In re Field, supra, the act here involved was designed and enacted for the benefit of only those who had military or naval service in World War II. Two classes of veterans were provided for; viz., (1) Veterans who were granted patents prior to September 2, 1945, upon inventions made by themselves, which patents had not expired and were still owned by them at the time of making application for extension; and (2) Veterans who need not have been inventors but who prior to September 2, 1945, and continuously thereafter, were the sole owners of patents regardless of how title thereto was acquired, which patents "had not expired prior to said date"—that is, September 2, 1945.

The purpose of the legislation is well understood. Many of those in service who owned patents either as inventors or as assignees were unable to exploit them because of their service duties, and as to many patents which were being exploited, the war with its varying demands for military supplies, priorities, and the like, vitally affected the income from the patents. So, Congress formulated the act upon the theory that justice would be served thereby.

There is nothing to indicate any purpose on the part of Congress to differentiate between veterans because of the character of their ownerships. In other words, we find nothing to indicate any legislative intent that an inventor owner should fare differently from an owner by inheritance or by assignment.

It is noted that in the case of a veteran other than the inventor, the statute expressly requires that he be the sole own-

er and that he should have been such prior to September 2, 1945, and continuously thereafter. In the Field case, supra, we held sole ownership to be required in the case of an inventor, the same as in the case of an owner by assignment. Such is deemed to be the logical and normal meaning of the phraseology of the law, and, in our opinion, the phrase "which is still owned by him" in its relationship to the context of section 1(a), supra, normally and clearly implies that the ownership must have been continuous as well as sole.

In the brief of the Solicitor for the Patent Office we find the following pertinent observations: "As was pointed out by this Court in In re Field [190 F.2d 268, 38 C.C.P.A., Patents, 1175], section 1(a) of Public Law 598 refers to two classes of veterans; those who acquired patents by grant to them as inventors and those who are sole owners, regardless of how they acquired title. The law makes no distinction between those two classes as regards the benefits to be accorded and there is no reason to suppose that there was any intention to treat them differently. A veteran who owned a patent by virtue of an assignment would obviously be damaged as much by inability to exploit it as would a veteran to whom a patent was granted as inventor; and the obvious purpose of the law was to compensate veterans who had suffered damage. There is nothing whatever in the act to indicate any intention to grant special privileges to inventors as distinguished from assignees."

The construction for which appellant contends seems to us to be strained and abnormal. It virtually would eliminate "still" from the law, in that it would result in a determination that "still owned by him" really means nothing more than that it is owned by him. Under such holding it would not seem to be required that the inventor should have owned the patent during the time he was in the military or naval service. He might have sold his interest and rights in it before entering the service and, upon reacquiring them after discharge, secured the extension provided.

The brief of the Solicitor for the Patent Office illustrates the possibility as follows: "* * * If that word ["still"] be construed as merely requiring that the veteran should own the patent at the time of applying for an extension, the result would be as follows: Suppose an inventor was granted a patent in 1933 and assigned the entire interest in it to a corporation the following year. Thereafter he served in the armed forces throughout the entire war, during which time he had no interest whatever in the patent and therefore received no income from it, thus satisfying the first requirement of section 1(b) of the law. Just before the patent expires, he obtains a reassignment of it for a nominal consideration, since it is of no further value to the corporation; giving the corporation a license if necessary. Thereupon he applies for an extension and, since the patent was granted to him, and since he 'still' owns it, if the statute is construed as urged by the present appellant, he is entitled to an extension of more than seven years, despite the fact that he has suffered no loss whatever, and the patent may have been fully exploited by the assignee during the war." The brief then comments: "It is obvious that the word 'still' cannot be construed to require ownership during the war years, but not during the remainder of the period between the grant of the patent and the filing of the application for extension; it either requires ownership throughout the entire period, or it means nothing at all. Accordingly, unless the interpretation adopted by the Commissioner is the proper one, the law will produce such obvious inequities as that suggested above."

We think there was no error in the decision of the Commissioner of Patents and it is affirmed.

Affirmed.

### Appeal No. 5894.

The issue in this case being precisely the same as that in Appeal No. 5893 our decision in No. 5893 is controlling.

The decision of the Commissioner of Patents is affirmed.

Affirmed.